**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ANDREW MICHAEL BERMAN,** | § | |
| **EUGENE RODRIGUEZ, JEROD** | § | |
| **SLAY, KENNAN VALES, DAWIT** | § | |
| **GEBREMARIAM, ALADDIN AFIA,** | § | |
| **KHALIL ANIBOU, HARGEWEYNI** | § | |
| **DAWIT, MARSHALL DEVON ISOM,** | § | |
| **RICHARD SCHUSTERMAN,** | § | |
| **ASHAGARI HABTEGABRIEL,** | § | |
| **MICHAEL LEYZERZON, ROMALE** | § | |
| **WALKER, SAMMY IBOK, GARY** | § | |
| **LASSIN, GLEN DEWALT, CHAN** | § | |
| **ZULFIQUAR, ROBERT NIETO, and** | § | |
| **THEOPHILUS DUCKETT, Individually** | § | |
| **and on behalf of all others similarly** | § | |
| **situated** | § | |
| | § | |
| **VS.** | § | **C.A. NO. _____** |
| | § | |
| | § | |
| **UBER TECHNOLOGIES, INC.** | § | **JURY DEMANDED** |

**PLAINTIFFS' ORIGINAL COMPLAINT AND**
**MOTION FOR COLLECTIVE ACTION/CERTIFICATION**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, KENNAN VALES, DAWIT GEBREMARIAM, ALADDIN AFIA, KHALIL ANIBOU, HARGEWEYNI DAWIT, MARSHALL DEVON ISOM, RICHARD SCHUSTERMAN, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER, SAMMY IBOK, GARY LASSIN, GLEN DEWALT, CHAN ZULFIQUAR, ROBERT NIETO,** and **THEOPHILUS DUCKETT** (hereinafter collectively referred to as "Plaintiffs")**,** complaining of **UBER TECHNOLOGIES, INC.** (hereinafter referred to as "Defendant" or "Uber"), and in support thereof would respectfully show unto the court as follows:

1

**NATURE OF SUIT**

1.      Plaintiffs' claims arise under the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 ("FLSA").

2.      The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers … ."  29 U.S.C. § 202(a).  To achieve its humanitarian goals, the FLSA defines appropriate pay deductions and sets overtime pay, minimum wage, and recordkeeping requirements for covered employers.  29 U.S.C. §§ 206(a), 207(a), 211(c).

3.      Defendant violated the FLSA by employing Plaintiffs and other similarly situated nonexempt employees "for a workweek longer than forty hours [but refusing to compensate them] for [their] employment in excess of [forty] hours … at a rate not less than one and one-half times the regular rate at which [they are or were] employed."  29 U.S.C. § 207(a)(1).

4.      Defendant violated the FLSA by failing to maintain accurate time and pay records for Plaintiffs and other similarly situated nonexempt employees as required by 29 U.S.C. § 211(c) and 29 C.F.R. pt. 516.

5.      Plaintiffs bring this collective action under 29 U.S.C. § 216(b) on behalf of themselves and all other similarly situated employees to recover minimum wage and overtime wages.

6.      Plaintiff further allege the following causes of action under Texas and/or federal law and statute: 1) fraud and fraud in the inducement in driver recruitment and daily operations; 2) unjust enrichment for the wrongful retention of toll charges and failure to properly compensate drivers for related expenses for their vehicles such as gas, additional insurance, maintenance costs, licensing fees, and certification fees all of which should be reimbursed by/paid for by Uber; 3) various violations and omissions with regard to the Form 1099's issued to the drivers; and 4)

breach of contract for wrongful retention of toll charges and other expenses incurred by the drivers in furtherance of their contractual obligations with Uber pursuant to the various agreements in place.

## CASE SUMMARY

7.      Defendant, Uber, misclassified their employees as independent contractors to avoid paying minimum wage and overtime per the FLSA.

8.      Uber did not pay their workers minimum wage and/or overtime as required pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.  ("FLSA").  Plaintiffs worked over forty (40) per week.  However, the facts of this case will show that the workers/ employees are not independent contractors, and are owed minimum wage and overtime pay.  This action seeks to recover all unpaid wages/compensation, liquidated damages, statutory damages, attorney's fees and costs owed to Plaintiffs for their individual claims, and collectively on behalf of all others similarly situated.

## JURISDICTION AND VENUE

9.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. 216(a) and (b) of the FLSA.  Moreover, this Court has jurisdiction pursuant to 28 U.S.C. §1332 as Plaintiffs and those similarly situated are residents of Texas and Defendant is a Delaware corporation with its principal place of business in California and who is authorized to do business in the State of Texas. Additionally, venue lies in this Court under 28 U.S.C. §1391 as the causes of action alleged herein are based upon actions and activities that substantially took place at all relevant times in the Houston Division of the Southern District of Texas.  By reason thereof, the jurisdiction and venue of this action is proper in any federal district court in the Southern District of Texas. Furthermore, the matter in controversy exceeds, exclusive of interest and costs, the sum

specified by 28 U.S.C. §1331 and accordingly, jurisdiction is proper before this court. All parties are subject to personal jurisdiction in the Southern District of Texas.

**PARTIES**

10.     Plaintiffs **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, KENNAN VALES, DAWIT GEBREMARIAM, ALADDIN AFIA, KHALIL ANIBOU, HARGEWEYNI DAWIT, MARSHALL DEVON ISOM, RICHARD SCHUSTERMAN, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER, SAMMY IBOK, GARY LASSIN, GLEN DEWALT, CHAN ZULFIQUAR, ROBERT NIETO,** and **THEOPHILUS DUCKETT** are former and current employees of Uber, and are represented by the undersigned.

11.     Defendant **UBER TECHNOLOGIES, INC.** is a Delaware corporation with its principal place of business located in San Francisco, California. At all relevant times, it was authorized to do business in the State of Texas. It may be served with process by serving its registered agent for service, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. Uber employed Plaintiffs, and with respect to the Plaintiffs, Uber is subject to the FLSA, as it was at all relevant times and/or was part of an enterprise engaged in interstate commerce as defined by 29 U.S.C. §§ 203(r) and (s).

12.     The Class Members are similarly situated Uber drivers, who worked for Uber during the last three years.

**INTRODUCTORY FACTS**

13.     This case is brought on behalf of individuals who have worked as Uber drivers in Texas. When agreeing to become drivers for Uber, Plaintiffs and all others similarly situated are required to enter into agreements all drafted unilaterally by Uber and all of which are consistently

revised by Uber, also unilaterally.

14.     Uber is a car service established in 2009 in California, that has engaged thousands of drivers across various states, including Texas, to transport riders through its Uber Black, Uber Select, and UberX services. Drivers can be hailed and dispatched through a mobile phone application which is maintained and operated by Uber. All UberX drivers are required to agree to the terms of a form contract, which governs their terms and conditions of their employment. Uber Black and Uber Select drivers have been required to sign a similar contract with Uber. In order to access the form, the Plaintiff must use a smartphone or electronic device. Upon accessing the Uber Driver App, Plaintiffs are required to sign an agreement, entitled "Transportation Provider Service Agreement" which contain arbitration provisions.

15.     Plaintiffs bring this action on their own behalf, and on behalf of other similarly situated Uber drivers, alleging the following causes of action under Texas and/or federal law and statute as alleged herein.

16.     Under Texas law, an independent contractor is one "who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details." However, in its daily interactions with Plaintiffs and all others similarly situated as drivers, Uber exerts a tremendous amount of control. For example, but not limited to just the following:

   a.     Uber requires its drivers to pass background checks, to accept a certain percentage of ride requests, to maintain high levels of customer satisfaction, and in some cases to pass tests on city knowledge and professionalism. If a driver fails to meet all these requirements, or engages in behavior Uber does not deem appropriate, Uber reserves the power to unilaterally, and in its

own discretion, suspend their ability to drive or to terminate them permanently by "deactivating" their account.

b.   A driver cannot decide to decline a ride based on where a passenger is going. If the driver accepts the ride and then cancels upon learning of the passenger's destination, the driver can be subject to termination.

c.   Uber collects the payment from the passenger, takes its percentage of the fee, and then distributes the driver's share to the driver. Uber determines the amount of the fares, and drivers have no ability to negotiate their own pay with customers or with Uber. Uber can unilaterally change its formula for calculating fares at any time, thereby determining the drivers' rate of pay.

d.   Uber's app also allows it to track when a driver is on-duty or off-duty. Uber monitors how many drivers are on-duty at a given time and sends frequent messages to encourage drivers to go on-duty and transport customers at times of high demand or when there are not enough drivers on the road.

e.   Uber informs its drivers that it "looks at" various metrics to "evaluate drivers," such as their acceptance rate, cancellation rate, how consistently a driver meets their estimated time of arrival, and the driver's vehicle quality and customer ratings. Drivers also receive customer ratings in the form of "star ratings" at the end of every trip. Uber utilizes this real-time feedback about drivers to monitor drivers and decide when a driver may need to be terminated. Whether a driver will be suspended or deactivated based on a particular star rating is subject to the Uber city manager's discretion, and standards vary by city and location and may even change week to week.

f.  Uber also determines whether to give drivers a second chance or to permanently terminate them, in some instances requiring a driver to take a class or asking a driver to reflect on "how they will improve" and why they "deserve another chance."

g.  Drivers also constantly receive emails from Uber, advising them about how to improve their ratings so as not to be deactivated or where to locate themselves to get customers, and warning them if they are at risk of suspension or deactivation for various reasons, including customer complaints, low customer ratings, canceling too many rides, or for failing to accept enough rides while "on-duty."  Uber often alerts drivers about the drivers' driving practices, such as whether the speed is too high or too low, or whether the driver is pressing on the breaks too harshly.

h.  Uber often refers drivers to training videos on its website to "refresh your knowledge on Uber's best practices."

i.  Uber also instructs drivers on vehicle cleanliness, proper appearance, and specific instructions on how to pick up riders. ("make sure to open the door for your client," "always ask them about the temperature and if they have a preferred radio station," and "make sure the radio is off or on soft jazz or NPR"); (have a "clean rear seat, fresh un-opened waters, clean carpets, no clutter, no papers in visor, front seat forward," and warning against "jeans, un-tucked shirt, sneakers"). While these "best practices" are couched as "suggestions", a driver's failure to comply with them can lead to their termination.

j.   Uber has the power and discretion to suspend drivers from driving for Uber, or to terminate drivers permanently for number of reasons, such as for accepting or soliciting cash tips, for having a dispatch acceptance rate that is too low, for asking the rider for a direct reimbursement for a cleaning fee rather than going through Uber to get reimbursed after a rider has left a mess in the car, for customer ratings that have fallen below the minimum threshold Uber allows, and for calling a client to check where their destination is, and then canceling the trip.

17.   The degree of control and micromanaging exerted by Uber over the daily activities of its driver such as Plaintiffs is monumental and mindblowing. The relationship between the Plaintiffs as drivers and Uber is clearly that of employer-employee. By misclassifying Plaintiffs as independent contractors, Uber is depriving Plaintiffs of those benefits and protections afforded employees under the law. These include but are not limited to a minimum wage, overtime wages, expense reimbursement, and health and unemployment insurance and benefits. Plaintiffs have been severely damaged as a result of being misclassified as independent contractors by Uber for which they now seek recovery.

18.   As alleged herein, Uber employs Plaintiffs as drivers but then misclassifies them as independent contractors. Plaintiffs are actually employees, and all worked in excess of 40 hours per week.

19.   Plaintiffs were not paid on a salary or fee basis. As defined and set forth in 29 C.F.R. § 541, none of Plaintiffs served in the capacity of executive, administrator, professional or outside sales representative. Therefore, Plaintiffs are not exempt from the protections provided under the FLSA.

20.    Uber employed and/or jointly employed Plaintiffs and the Class Members. At all times relevant hereto, Uber knew of, approved of, and benefited from Plaintiffs' regular and overtime work.

21.    Uber's gross annual revenues have well exceeded the FLSA's $500,000.00 threshold for enterprise coverage for at least each of the last three years.

22.    Uber's employees routinely used vehicles, tools, equipment, telephones, and computers.

23.    Uber is a covered enterprise under the FLSA during at least each of the last three years because they met the $500,000.00 gross revenue threshold, and because their employees used, handled, or worked on goods or materials that were produced for interstate commerce or actually traveled in interstate commerce.

24.    Uber determined the hours Plaintiffs and Class Members worked.

25.    Uber determined Plaintiffs' and Class Members' duties as well as the work locations.

26.    Uber made personnel and payroll decisions, including Plaintiffs' and the Class Members' pay rates, their job assignments, and the decision to not pay them minimum wage or overtime.

27.    Uber had the power to hire and fire Plaintiffs and Class Members.

28.    Plaintiffs and Class Members regularly worked more than forty (40) hours in a workweek.  Uber did not pay them the extra time and a half required pursuant to the FLSA.

29.    Uber knew Plaintiffs and Class Members worked over forty (40) hours per week and that they did not receive overtime pay.

## FLSA INDIVIDUAL CLAIMS

30.    Plaintiffs, **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, KENNAN VALES, DAWIT GEBREMARIAM, ALADDIN AFIA, KHALIL ANIBOU, HARGEWEYNI DAWIT, MARSHALL DEVON ISOM, RICHARD SCHUSTERMAN, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER, SAMMY IBOK, GARY LASSIN, GLEN DEWALT, CHAN ZULFIQUAR, ROBERT NIETO,** and **THEOPHILUS DUCKETT** worked more than 40 hours per week.

31.    After deducting employment related expenses, Plaintiffs, **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, KENNAN VALES, DAWIT GEBREMARIAM, ALADDIN AFIA, KHALIL ANIBOU, HARGEWEYNI DAWIT, MARSHALL DEVON ISOM, RICHARD SCHUSTERMAN, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER, SAMMY IBOK, GARY LASSIN, GLEN DEWALT, CHAN ZULFIQUAR, ROBERT NIETO,** and **THEOPHILUS DUCKETT** made less than minimum wage.

32.    Plaintiffs, **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, KENNAN VALES, DAWIT GEBREMARIAM, ALADDIN AFIA, KHALIL ANIBOU, HARGEWEYNI DAWIT, MARSHALL DEVON ISOM, RICHARD SCHUSTERMAN, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER, SAMMY IBOK, GARY LASSIN, GLEN DEWALT, CHAN ZULFIQUAR, ROBERT NIETO,** and **THEOPHILUS DUCKETT** were misclassified as an independent contractor.

33.    Plaintiffs, **ANDREW MICHAEL BERMAN, EUGENE RODRIGUEZ, JEROD SLAY, KENNAN VALES, DAWIT GEBREMARIAM, ALADDIN AFIA, KHALIL**

ANIBOU, HARGEWEYNI DAWIT, MARSHALL DEVON ISOM, RICHARD SCHUSTERMAN, ASHAGARI HABTEGABRIEL, MICHAEL LEYZERZON, ROMALE WALKER, SAMMY IBOK, GARY LASSIN, GLEN DEWALT, CHAN ZULFIQUAR, ROBERT NIETO, and THEOPHILUS DUCKETT were not paid overtime.

## COLLECTIVE ACTION ALLEGATIONS

34.     In addition to the above Plaintiffs, Uber employs many other drivers who were also not properly paid under the FLSA for minimum wage and overtime pay, and who were misclassified. These workers are entitled to minimum wage and overtime pay for the same reasons as Plaintiffs, and are therefore similarly situated to Plaintiffs. These workers are collectively referred to as the "Class Members."

35.     Thousands of these employees/drivers have worked for Uber over the last few years. Accordingly, Uber's failure to pay properly due and owing FLSA compensation extends well beyond the Plaintiffs listed herein.

36.     Pursuant to 29 U.S.C. § 216(b), these Class Members should be notified of this action and given the opportunity to join.  Therefore, the class is properly defined as.

**Uber drivers who have not agreed to an arbitration agreement, have not opted out of the arbitration agreement, and who in the past three (3) years were drivers for Uber**.

37.     Accordingly, Plaintiffs move that the Court certify this matter as a collective matter and request that notice be provided to all similarly situated claimants.

## CAUSE OF ACTION

38.     By failing to pay Plaintiffs and the Class Members minimum wage and overtime at one-and-one-half times the minimum wage rate, Defendant violated the FLSA's employee pay provisions.

39.     Uber owes Plaintiffs and the Class Members the difference between the money paid to them and what should have been paid under the FLSA.  Since Uber's conduct was willful and/or Uber knew and/or showed reckless disregard that their pay practices violated the FLSA, Uber owes these Plaintiffs and class members wages for at least the past three years.

40.     Uber is liable to Plaintiffs and the Class Members for an amount equal to all unpaid FLSA wages, penalties, fees, and all other damages allowed by law.

41.     Plaintiffs and Class Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## CONSENT TO COLLECTIVE ACTION

42.     Each of the named Plaintiffs in this Complaint not only intends to pursue their claims individually, but also consents to be included as a plaintiff in any collective action that may be approved by this Court.  All named Plaintiffs in this Complaint hereby consent to any collective action, and respectfully requests that this honorable Court recognize this written consent as their written consent, to the extent required by law, to be a party to a collective action.  If, for any reason, the Court denies the collective action claims, or any other arguments or allegations are made to defeat the collective action, then all named Plaintiffs still wish to pursue their claims and causes of action, individually.

## STATEMENT OF GENERAL FACTS

43.     Uber is a car service established in 2009 in California, that has engaged thousands of drivers across various states, including Texas, to transport riders through its Uber Black, Uber Select, and UberX services. It provides this car service in cities throughout the country via an on-demand dispatch system that only it controls. Uber offers customers the ability to hail a car-service driver on a mobile phone application and its website has advertised that "Uber is your on-demand

private driver." Uber relies entirely on individuals such as the Named and putative Plaintiffs, who it classifies as independent contractors, to perform the transportation service that is not only at the heart of its business but its only business and the business it is recognized worldwide as providing. To put it bluntly, without drivers such as Plaintiffs, Uber would not exist.

44.     All UberX drivers are required to agree to the terms of a form contract, which governs their terms and conditions of their employment. In order to access the form, the drivers must use a smartphone or electronic device.  Upon accessing the Uber Driver App, Plaintiffs are then capable of being summoned by passengers/customers. But without any advance notice and on numerous occasions since first offering the service in Texas, Uber has presented the Plaintiffs and all drivers through this mobile phone application with a new, revised form contract all drivers are then required to sign. Without pressing the button indicating an agreement with all the terms, the drivers cannot be summoned by passengers and thus earn an income. These agreements consistently state one way or another that Uber reserves the right to withhold or revoke its approval and authorization of any Driver at any time, in its sole and unreviewable discretion. Pursuant to the agreements, all drivers are required to maintain a valid driver's license and all licenses, permits, and other legal prerequisites necessary to perform transportation services and to update those documents as necessary. The agreements require that while signed in to drive for Uber, drivers must perform transportation services only for Uber and they cannot display on their vehicles any removable insignia provided by third-party transportation service providers, or other lead generation providers. The agreements further require that drivers' vehicle models be no more than ten years old, though Uber's representatives will often refuse to allow plenty of far newer vehicles from being used as Uber cars. The agreements reference "Uber's star rating system" and note that

drivers "with low ratings may be limited in their right to accept Requests." The terms of the form agreements are identical, or substantially similar, for every UberX driver.

45.     Uber Black and Uber Select drivers have also been required to sign and agree to similar agreements with Uber. These agreements give Uber the right to terminate the agreements automatically, without any notice requirement, at such "moment when the Transportation Company and/or its Drivers no longer qualifies, under the applicable law or the quality standards of Uber, to provide the Driving Service or to operate the Vehicle." These agreements also provide that Uber will receive a "Fee per Ride" which "is calculated as a percentage of each Fare" and "which shall be set by Uber at Uber's sole discretion based upon local market factors and may be subject to change." As with all Uber drivers, thses drivers must also maintain a minimum star rating. All drivers also agree to submit to a background check and maintain a valid driver's license "and all licenses, permits, and other legal prerequisites necessary" to perform commercial transportation services.

46.     No one but Uber calculates all fares. The drivers have no ability to negotiate the rates or prices charged to customers or the percentage of the fare retained by Uber. The general manager of each city has the discretion to set the pricing for the various Uber "platforms" of UberX, Uber Black, and Uber Select. Whenever a customer takes a ride, Uber handles the billing of the customer's credit card and remits the driver's share, less the amount of its own commission, and any other fees or expenses Uber decides to collect directly from the driver. With respect to Uber Black drivers who might drive through an intermediary transportation companies, Uber remits the driver's share to the intermediary company, which may or may not deduct additional amounts before passing the rest of the fare on to the driver.

47.    Plaintiffs and others similarly situated applied for and were accepted by Uber to become drivers in the State of Texas for Uber pursuant to the terms and conditions of the agreements between them, which agreements Plaintiffs and other similarly situated were required to execute and enter into if they wanted to become drivers for Uber.

48.    Although classified as independent contractors, Uber drivers are employees. Uber requires its drivers to pass background checks, to accept a certain percentage of ride requests, to maintain high levels of customer satisfaction, and in some cases to pass tests on city knowledge and professionalism. If a driver fails to meet all these requirements, or engages in behavior Uber does not deem appropriate, Uber reserves the power to unilaterally, and in its own discretion, suspend their ability to drive or to terminate them permanently by "deactivating" their account. To use Uber, a rider hails a driver by using the Uber App on their phone, and the on-duty Uber driver that is nearest to them is notified. The driver is able to see where the passenger wants to be picked up but has no information about where they are going. Thus, a driver cannot decide to decline a ride based on where a passenger is going.  If the driver accepts the ride and then cancels upon learning of the passenger's destination, the driver can be subject to termination. Once the driver accepts the request by tapping a button on their phone, they drive to the passenger's pick-up location and tap another button to indicate they are arriving. The driver then picks up the passenger and hits a button to "Begin Trip," drives the passenger to their destination, and hits another button to "End Trip" when they have reached the passenger's destination.  Uber collects the payment from the passenger, takes its fee, and then distributes the driver's share to the driver. Drivers are paid via direct deposit to their bank account on a weekly basis.  Uber determines the amount of the fares, and drivers have no ability to negotiate their own pay with customers or with Uber. Fares are calculated based on a minimum fare, plus a per minute fee when the car is moving less than 11

mph and a per mile fee when the car is moving more than 11 mph. Fares vary depending on the type of service being utilized and the location, but fares for UberBlack are typically higher. Uber can unilaterally change its formula for calculating fares at any time, thereby determining the drivers' rate of pay. Uber's system also allows it to track when a driver is on-duty or off-duty. Uber monitors how many drivers are on-duty at a given time and sends frequent messages to encourage drivers to go on-duty and transport customers at times of high demand or when there are not enough drivers on the road.

49.     There is no doubt that Uber carefully monitors and controls drivers' performance. Indeed, Uber's agreement with UberBlack drivers states that "Uber may terminate this Agreement automatically, without any notice requirement, at such moment when the Transportation Company and/or its Drivers no longer qualifies, under the applicable law or the quality standards of Uber, to provide the Driving Service or to operate the Vehicle." Uber informs its drivers that it "looks at" various metrics to "evaluate drivers," such as their acceptance rate, cancellation rate, how consistently a driver meets their estimated time of arrival, and the driver's vehicle quality and customer ratings. Drivers also receive customer ratings in the form of "star ratings" at the end of every trip. These ratings are out of 5 stars, with 5 stars being the highest rating and 1 star being the lowest. Uber utilizes this real-time feedback about drivers to monitor drivers and decide when a driver may need to be terminated. Whether a driver will be suspended or deactivated based on a particular star rating is subject to the Uber city manager's discretion, and standards vary by city and location and may even change week to week. Uber also exercises discretion when determining whether to give drivers a second chance or to permanently terminate them, in some instances requiring a driver to take a class or asking a driver to reflect on "how they will improve" and why they "deserve another chance."

50.     Drivers also constantly receive emails from Uber, advising them about how to improve their ratings so as not to be deactivated or where to locate themselves to get customers, and warning them if they are at risk of suspension or deactivation for various reasons, including customer complaints, low customer ratings, canceling too many rides, or for failing to accept enough rides while "on-duty."  Uber often refers drivers to training videos on its website to "refresh your knowledge on Uber's best practices." Uber alerts drivers about the drivers' driving practices, such as whether the speed is too high or too low, or whether the driver is pressing on the breaks too harshly. Uber also instructs drivers on vehicle cleanliness, proper appearance, and specific instructions on how to pick up riders. ("make sure to open the door for your client," "always ask them about the temperature and if they have a preferred radio station," and "make sure the radio is off or on soft jazz or NPR"); (have a "clean rear seat, fresh un-opened waters, clean carpets, no clutter, no papers in visor, front seat forward," and warning against "jeans, un-tucked shirt, sneakers"). While these "best practices" are couched as "suggestions", a driver's failure to comply with them can lead to their termination. For example, Uber has the power and discretion to suspend drivers from driving for Uber, or to terminate drivers permanently for number of reasons, such as for accepting or soliciting cash tips, for having a dispatch acceptance rate that is too low, for asking the rider for a direct reimbursement for a cleaning fee rather than going through Uber to get reimbursed after a rider has left a mess in the car, for customer ratings that have fallen below the minimum threshold Uber allows, and for calling a client to check where their destination is, and then canceling the trip.

51.     In addition, Uber is in the business of providing car service to customers, and that is the service that Uber drivers provide. The drivers' services are fully integrated into Uber's business, and without the drivers, Uber' s business would not exist. It is only through the use of

Uber's mobile phone application that Named Plaintiffs and others similarly situated are provided with individuals and fares to pick up. As stated herein, Uber sets the amount of each fare with no input by the drivers. Moreover, Uber unilaterally determines how each fare is split between Uber and the drivers. Uber maintains records concerning the drivers to include GPS records, mileage and time records, and number of fares. While a driver may decide when to turn on his app, he has no input over what passengers he is forced to pick up, regardless of location, expected revenue, passenger behavior, etc. Nor can the driver avoid turning on the app for too long without Uber threatening suspension or termination. Finally, the agreements required by Uber in order to become an Uber driver are prepared by Uber, and are what is known as contracts of adhesion. The drivers have no input into the content of the agreement, and are left with no choice but to agree to the form if they want to drive for Uber.

52.     However, and notwithstanding the amount of control Uber has over the drivers and their ability to drive for Uber, Uber intentionally and unlawfully misclassifies the drivers as independent contractors. Uber drivers are guaranteed no hourly wage or compensation for overtime work, which most drivers are forced to accept just to eke out a small profit above their costs. Uber drivers are required to bear many of the expenses of their employment, including expenses for their vehicles, gas, additional commercial insurance, as well as other expenses such as city permit fees. Moreover, Uber benefits from the additional qualifications some of their Uber Select and Uber Black drivers provide such as additional commercial insurance and the ability to pick up passengers at local airports, all of which cost the drivers which costs are not reimbursed or even shared by Uber. Finally, by misclassifying its drivers as independent contractors, Uber absolves itself of the requirement to pay to the various states and the federal government the state

and federal withholdings an employer typically pays from the withholdings collected from an employee's pay.

## CAUSES OF ACTION

### Fraud and fraud in the inducement

53.     Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 52.

54.     Uber has consistently misrepresented what drivers could earn driving for Uber to include distributing a video guaranteeing that drivers could earn upwards of $100,000.00 annually driving for Uber. Given the current fare structures, an individual would have to drive an exorbitant number of hours on a daily, weekly and monthly basis for even approach gross fares totaling this amount, much less earn this amount. Uber knew such statements were fraudulent and misleading and also knew that individuals would rely on such misrepresentations when deciding to become Uber drivers. Yet Uber continued this fraudulent and wrongful course of conduct with the intent being to increase its overall total number of drivers so as to saturate the market. This saturation then had the overall realistic effect of guaranteeing that such earnings were impossible. Additionally, based on these misrepresentations, many drivers either purchased or leased new vehicles so as to meet Uber's vehicle requirements. However, once they found out that an adequate number of fares, i.e. passengers, was not available, thereby reducing their earnings, many of these drivers are now left with monthly car payments that are financially onerous and without the guaranteed income as promised by Uber in addition to increased insurance payments as they vehicles were newer and required increased coverage limits.

55.     Uber has also consistently set up its drivers such as Plaintiffs herein to fail by also making fraudulent representations that during certain events, such as Super Bowl weekend, or even

daily rush hour traffic, the number of fares will be such that all drivers will be handling fares one right after the other and that many of these fares will be what Uber calls "Surge" fares, i.e., higher fare rates because of the special event or heavy traffic period (i.e rush hour times). However, as with all of Uber's other representations, these turned out to be just as false as the end result was more drivers than available fares leaving many drivers with empty cars to go along with Uber's empty promises. Often Uber does collect the "surge" fare from the passenger, but fails to pay the driver anything more than standard rates.

56.     Plaintiffs allege that:

a.      Uber consistently misrepresents what drivers could earn driving for Uber to include the distribution of a video guaranteeing that drivers could earn upwards of $100,000.00 annually driving for Uber.

b.      Uber consistently tells the drivers that during certain events, times of the days, and certain days, i.e., morning and evening rush hour, Halloween, Super Bowl Sunday, concerts, it would institute "Surge Pricing", an exercise whereby fares are increased and theoretically resulting in higher earnings for the drivers such as the Plaintiffs herein. What Uber says and what it does are two different things. Uber controls which drivers are directed to "Surge" passengers without forewarning the driver who signs into the app to work.  Moreover, Uber unilaterally decides whether or not it will even charge Surge Pricing for the events in which they advertised to drivers a "Surge" fare. Yet Plaintiffs rely on Uber's representation, act accordingly based on what they have been told by Uber, then suffer the consequences including missing out on other fares that would not have been

considered "surge fares" because they have been relocated to other parts of the city. In many other instances, Uber will flood the "surge" market with more drivers than potential passengers, thereby guaranteeing that the drivers will end up with empty cars and no fares.

c.     Uber issues Form 1099's to the drivers that purport to report the drivers' gross earnings, the various deductions and Uber fees the drivers are subject to and then ultimately the "net" income earned by the drivers. However, Uber reports the gross revenue from a single car that Uber collects directly on the driver's 1099, rather than the net payment to the driver, which will always be inflated and inaccurate thereby exposing the drivers to increased tax liability. This practice results in Uber benefiting by reporting higher earnings so as to wrongfully convince the drivers that they were making more money than they actually were and to continue being the darling of the venture capital world.

d.      Uber retains the right to penalize and terminate any driver if that driver cancels too many fares or if too many passengers the driver was supposed to pick up change their mind and cancel the driver. Contrary to that action, Uber represents to the drivers a specified "cancellation" opportunity exists for various reasons to include if the passenger does not show up after a certain period of time. In those instances, the driver is not supposed to be penalized. However, many drivers are in fact penalized and denied access to the app thereby incurring damages.

57.     These are all examples of Uber's fraudulent conduct. During all relevant times, Uber's representations were known by it to be false when they were made recklessly without knowledge of the truth and were made as positive assertions. In connection with the interactions between Plaintiffs and Uber, Uber directly and indirectly made material representations to Plaintiffs concerning the underlying agreements, the nature of the relationship between the parties, and the actions to be taken by and between the parties based on this relationship.

58.     Uber is the party Plaintiffs allege who has committed all of the fraudulent acts, both past and present. Uber is the author of the communications whether they be emails, videos, or statements made on Uber's website. The specific individual authors are not identified as the communications come from "Uber".  Therefore, no one else was committing the alleged acts but Uber.  All of those specific fraudulent acts described in detail herein are those acts which Plaintiffs allege were fraudulent and which were perpetrated by Uber. Moreover, Uber has committed these acts during the recruitment process to induce Plaintiffs and others similarly situated to sign on as drivers and then continues to commit these fraudulent acts throughout Plaintiffs' time as drivers to continue to induce them to remain as drivers. Uber commits it fraud by repeatedly and consistently saying one thing and repeatedly doing another in all those mediums Uber uses to recruit drivers, the videos and websites, the numerous emails Uber sends to the drivers telling them what they can earn, how Uber plans on maximizing their earning opportunities through surge pricing, and the continual contacts through the app and on the drivers' smartphones and in emails to the drivers.

59.     Uber intended that Plaintiffs rely to their detriment and injury upon the false statements and impressions of fact being made, and on the presumption that no material facts of the contrary existed. Uber clearly wanted Plaintiffs to become drivers and knew that if it fully and

honestly disclosed that it would not fully reimburse Plaintiffs for their out-of-pocket expenses and other charges or that they would not earn as much as was represented to them by Uber that Plaintiffs would not sign on as drivers. Plaintiffs believed what Uber was telling them. Plaintiffs did in fact rely to their detriment upon the false statements and impressions of fact purposely created by Uber by becoming drivers for Uber and continuing as drivers to this day in many instances.  As a result of Defendants' fraudulent statements, concealments and failure to disclose, Plaintiffs have been damaged. Plaintiffs not only became drivers for Uber based on the represented terms, but also they also incurred additional debts and expenses and other financial obligations as detailed herein all of which have placed undue financial burdens on Plaintiffs in addition to causing them to incur unreimbursed expenses and charges.

60.    Uber's actions were intentional and made with knowing disregard for the rights of the Plaintiffs. Consequently, Plaintiffs pray for punitive damages in addition to compensatory damages.

**Unjust Enrichment**

61.    Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 60.

62.    Uber has also been unjustly enriched by not fully reimbursing Plaintiffs for their travel related expenses such as toll charges and increased cost of insurance and required governmental permits/licenses and by not providing those other benefits usually and customarily provided to employees to include but not be limited to such as fair hourly wages, overtime wages, unemployment insurance, Social Security and worker's compensation insurance. By shifting the costs of compliance with local regulations and ordinances and then not reimbursing the Plaintiffs, Uber has in essence saved considerable sums of money that normally would have been paid by

Uber. Plaintiffs' compliance with the local regulations and ordinances allows Uber to reap the benefits of those UberBlack Plaintiffs who are able to charge more thereby generating greater revenues for Uber. Uber has unjustly realized these benefits because of and through its fraudulent conduct and its overwhelmingly superior bargaining position. Uber unilaterally sets the payment schemes under which its drivers, such as Plaintiffs, are paid. Uber unilaterally revises the driver agreements that all drivers, such as Plaintiffs, are required to enter into and agree to. Uber unilaterally decides whether a driver continues to drive for Uber or whether that driver is deactivated and not allowed to drive and earn a living. Uber unilaterally decides what it will reimburse Plaintiffs for and what it will not yet at the same time requiring Plaintiffs to incur additional costs and expenses. Drivers are nothing more than pawns in Uber's power grab to monopolize the transportation industry.

63.     By reason of Uber's unjust enrichment and its acts and omissions, Plaintiffs have been severely damaged for which they now seek to recover.

## **Breach of Contract**

64.     Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 63.

65.     Uber has represented to its drivers, Plaintiffs included, that if they incur toll charges during the course of passenger's ride, that Uber will reimburse them the full amount of the toll charges. The applicable driver agreements explicitly state that Uber will collect from the passengers those applicable toll charges that the drivers incur and then remit to the drivers those tolls collected from the passengers. However, that is not the case. Uber charges the passengers the full toll charge when calculating their fare that is charged to their credit cards. These are charges that the drivers are charged by the toll authorities which in turn should be reimbursed in full to

them by Uber. On numerous occasions, Plaintiffs have only received a partial reimbursement for these toll charges in total contravention of Uber's representations and the agreements in place to fully reimburse the drivers for these toll charges. Additionally, Plaintiffs also incur insurance, certification fees, and licensing costs and expenses, none of which are reimbursed by Uber but all of which are required by Uber for Plaintiffs to be drivers.

66.     Plaintiffs clearly performed at all times as required under the terms and provisions of the various Agreements in place between them and Uber. Plaintiffs accessed the app, picked up passengers and drove them to their final destinations, all as required. Plaintiffs have paid the toll charges incurred in transporting the passengers Uber is making money off of and have also paid the additional costs due to required and increased insurance coverage as well as the other required licensing and certification fees and expenses. Uber has not performed as required under the relevant agreements in that it has failed to fully reimburse Plaintiff those toll charges they have incurred in addition to the additional costs due to required and increased insurance coverage as well as the other required licensing and certification fees and expenses. As a direct and proximate result of said breaches by Uber, Plaintiffs have been severely damaged.

**The flagrant and persistent misreporting of driver income on Form 1099's**

67.     Plaintiffs incorporate herein by reference the factual statements set out in Paragraphs 1 through 66.

68.     As Plaintiffs are misclassified as independent contractors, they receive Form 1099's from Uber reporting their gross earnings, the various deductions and Uber fees the drivers are subject to (many of which are questionable in their own right such as the "Safe Rides Fee" Uber charges the passengers and then keeps for itself by not including it in the calculation of that passenger's total fare on which the driver's percentage is calculated) and then ultimately the "net"

income earned by the drivers. However, not only were there frequent instances when Uber refused to mail the 1099 forms within the proscribed time limits to the drivers as required, Uber reports the gross revenue from a single car that Uber collects directly on the driver's 1099, rather than the net payment to the driver, which will always be inflated and inaccurate thereby exposing the drivers to increased tax liability. Yet at the same time, Uber enjoyed the benefit of reflecting higher earnings so as to wrongfully convince the drivers that they were making more money than they actually were and to continue being the darling of the venture capital world.

69.     Plaintiffs and all others similarly situated hereby request that they recover their damages proximately caused by Defendant's conduct.

## JURY DEMAND

70.     Plaintiffs and all others similarly situated request a trial by jury on all of their claims.

WHEREFORE PREMISES CONSIDERED, Plaintiffs and all others similarly situated request that this Court certify this case as a class action, pursuant to Fed. R. Civ. P. 23; award restitution for all charged gratuities which were not remitted to the drivers; award reimbursement that the drivers who were misclassified as independent contractors were required to bear; award pre- and post-judgment interest; award reasonable attorneys' fees, costs, and expenses; and award any other relief to which the Plaintiffs may be entitled.

## PRAYER

Plaintiffs pray for relief as follows:

a.     An order allowing this action to proceed as a collective action under the FLSA, and directing notice to the Class Members;

b.     Judgment against Uber for an amount equal to Plaintiffs' unpaid overtime;

c.      Judgment against Uber that it its violations of the FLSA were willful.

d.      An amount equal to the unpaid wages damages as liquidated damages;

e.      A finding that Plaintiffs are employees and thereby entitled to all relevant and pertinent benefits;

f.      An award for all charges and related expenses incurred by Plaintiffs;

g.      Prejudgment interest;

h.      All costs, recoverable expenses and attorney's fees incurred in prosecuting these claims;

i.      For such further relief as the Court deems is just and equitable.

Respectfully submitted,

OF COUNSEL:

**SEARS & CRAWFORD, LLP**
Ross A. Sears, II
State Bar No. 17960011
1200 Rothwell Street
Houston, Texas 77002
Telephone: (713) 223-3333
Facsimile: (713) 223-3331
Email: ross@searscrawford.com

**KLITSAS & VERCHER P.C.**
Loren G. Klitsas
Federal Bar No.: 16451
550 Westcott, Suite 550
Houston, Texas 77007
Telephone: 713-862-1365
Facsimile: 713-862-1465
klitsas@kv-law.com

**THE GOLDBERG LAW OFFICE, PLLC**
Daniel J. Goldberg
TBN 24052856
2006 Commonwealth Street
Houston, Texas 77006
Telephone: 713-942-0600
Facsimile: 713-942-0601
DJG@LawGoldberg.com

**LAW OFFICES OF KEVIN R. MICHAELS, P.C.**

By: */s/ Kevin R. Michaels*
    Kevin R. Michaels
    State Bar No.: 00784598
    888 W. Sam Houston Pkwy. S., Suite 226
    Houston, Texas 77042
    Telephone: 281-496-9889
    Facsimile: 281-496-4211
    kmichaels@michaelslaw.net

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**